## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ROBERT M. GATES, Secretary of Defense, in His Official Capacity, )<br><br>Defendant. ) | Case No. 1:07-mc-00220 (JB)<br>Case No. 1:07-mc-00221 (JB)<br>Case No. 1:07-mc-00222 (JB) |

### PRAECIPE

Congressmen Duncan Hunter, Darrell E. Issa and Brian P. Bilbray respectfully bring to

the Court's attention the attached Order Denying Plaintiffs' Motion for Summary Judgment; and

Order Granting Defendants' Motion for Summary Judgment (July 29, 2008), entered by Judge

Burns of the U.S. District Court for the Southern District of California in *Trunk, et al. v. City of*

*San Diego, et al.*, No. 06-cv-1597, which is consolidated there with *Jewish War Veterans of the*

*United States of America, Inc., et al. v. Gates*, No. 06-cv-1728.

Respectfully submitted,

IRVIN B. NATHAN (DC Bar No. 90449)
General Counsel
s/Kerry W. Kircher
KERRY W. KIRCHER, DC Bar #386816
Deputy General Counsel
CHRISTINE DAVENPORT
Assistant Counsel
JOHN FILAMOR, DC Bar #476240
Assistant Counsel

RICHARD KAPLAN (DC Bar No. 978813)
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700 (telephone)
E-mail: kerry.kircher@mail.house.gov
Counsel for Congressmen Duncan Hunter, Darrell
E. Issa and Brian P. Bilbray

July 30, 2008

## CERTIFICATE OF SERVICE

I certify that on July 30, 2008, I served the foregoing Praecipe through the electronic case filing system, and by .pdf email on the following:

> Ryan Phair, Esq.
> Wilmer Cutler Pickering Hale and Dorr
> 1875 Pennsylvania Avenue, NW
> Washington, D.C.   20006
> Email: ryan.phair@wilmerhale.com
>
> Ryan Nelson
> U.S. Department of Justice, ENRD
> Natural Resources Section
> 601 D Street, NW
> P.O. Box 663
> Washington, D.C.   20004-0663
> Email: ryan.nelson@usdoj.gov

> s/Kerry W. Kircher
> Kerry W. Kircher
> E-mail: kerry.kircher@mail.house.gov

1

2

3

4

5

6

7

8 # UNITED STATES DISTRICT COURT

9 ## SOUTHERN DISTRICT OF CALIFORNIA

10

11 STEVE TRUNK,

12                                      Plaintiff,

13      vs.

14

15 CITY OF SAN DIEGO, UNITED STATES OF AMERICA, ROBERT M. GATES, Secretary of Defense and DOES 1

16 through 100, inclusive,

17                                      Defendants.
   _____

18 MOUNT SOLEDAD MEMORIAL

19 ASSOCIATION,

20                          Real Party in Interest.
   _____

21 JEWISH WAR VETERANS OF THE

22 UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB,

23 and JUDITH M. COPELAND,

24                                      Plaintiffs,

25      vs.

26 ROBERT M. GATES, Secretary of Defense, in his official capacity,

27                                      Defendant.

28 _____

CASE NO. 06cv1597-LAB (WMc)
(Consol. w/06cv1728-LAB (WMc)

**ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT; AND**

**ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

- 1 -

## I.  Introduction

For 54 years, a Latin cross has stood as part of a veterans' memorial atop Mt. Soledad in the San Diego community of La Jolla.  In 2006, Congress acquired the site by eminent domain from the City of San Diego, ostensibly to ensure its preservation.  The Jewish War Veterans of the United States of America, Inc. ("Jewish Veterans" or "JV") and four individual plaintiffs brought suit against the United States, challenging Congress' taking of the Mt. Soledad site and the presence of the cross on federal property as violations of the Establishment Clause of the First Amendment.  In an earlier ruling, this Court dismissed the challenge to the land transfer for lack of standing — a decision that is now final.  *Trunk v. City of San Diego*, 547 F. Supp. 2d 1144 (S.D. Cal. 2007), *appeal dismissed*, ___ F.3d ___ (9th Cir., June 11, 2008) (table).  Left to decide is whether permitting the cross to remain as part of the veterans' memorial amounts to an unconstitutional establishment of religion.  Plaintiffs bear the burden of demonstrating the presence of the cross is unconstitutional.  *INS v. Chadha*, 462 U.S. 919, 944 (1983).

All parties[1] agree the record is complete, and the Court may decide the issue on summary judgment.  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court recognizes and adheres to this standard.

## II.  Discussion

The history of the Mt. Soledad memorial goes back nearly a century and is documented in large part in *Ellis v. City of La Mesa*, 990 F.2d 1518, 1521 (9th Cir. 1993); *see also Paulson v. Abdelnour*, 145 Cal. App. 4th 400, 407–08 (Cal. App. 4 Dist. 2006) (recounting history after 1993).  The memorial is situated on a hill a few miles north of

---

[1]  In addition to the parties' briefing, the Court has accepted two *amicus* briefs.  One was filed on behalf of thirty-three members of the House of Representatives (collectively, the "Congressional *Amici*"), and a second was filed on behalf of the families of two Marines killed in Iraq who are honored with plaques at the memorial ("Martino-Bloomfield *Amici*").

downtown San Diego, and commands a panoramic view of the surrounding area. Visitors come to the site not only to visit the memorial but to enjoy the view. The following facts are uncontested:

A redwood cross was first erected by private citizens on land owned by the City of San Diego on Mt. Soledad in 1913. Some time afterward, the site was designated as public parkland. The original cross was either stolen or destroyed in 1923, but it was later replaced with a cross made of stucco and wood. The second cross stood on Mt. Soledad until it was blown down on March 13, 1952. A coalition of religious and civic organizations then formed the Mt. Soledad Memorial Association ("MSMA"), with the goal of replacing the second cross with a new one.[2] The new cross was erected in 1954 and has remained atop Mt. Soledad since. The cross is 29 feet tall (43 feet tall if the base is included), and is made of recessed concrete. A tall metal fence surrounds the cross and prevents access to it. Although the memorial comprises other symbols and objects attesting to the service and sacrifice of war veterans, it is only the cross as part of the memorial that is at issue.[3]

The Mt. Soledad memorial was officially dedicated on Easter Sunday, 1954, to fallen veterans of World Wars I and II and the Korean War. The La Jolla town council[4] sponsored the ceremony and both religious and military leaders participated. Over the years, the site has been used for religious and non-religious events, including Easter sunrise services (some of which have been broadcast to troops overseas), veterans' reunions, memorial services, weddings, and family gatherings.[5] There is little evidence of events before 1954,

---

[2] The evidence identifies the MSMA as a civic organization, although the MSMA is characterized as friendly to religious organizations and willing to sponsor events with a religious emphasis. There is no evidence the MSMA itself is a religious organization.

[3] The parties have submitted photographs of the memorial, depicting the cross and other features from different angles and vantage points. A fair, representative view of the memorial cross can be found at http://www.lajollalight.com/content/img/f241532/soledad.jpg.

[4] The La Jolla town council, like other town councils in the City of San Diego, is a volunteer organization of citizens and businesses.

[5] Besides being an element of the memorial, the United States has offered uncontested evidence the cross has historically been used for surveying and navigation. In 1934, the U.S. Coast and Geodetic Survey adopted the cross as an azimuth marker on the

1   except for Easter services, which were held on the site even before the current cross was
2   erected.  There is no history of discrimination between religious and nonreligious groups in
3   the issuance of municipal permits to use the site.

4        After litigation against the City of San Diego over the cross' presence was initiated in
5   1989, the MSMA began making changes to the memorial.  The cross was conspicuously
6   marked with a bronze plaque noting its status as a veterans' memorial, and other features
7   were added to the site.  These include six large concentric walls displaying over two
8   thousand engraved, formal black granite memorial plaques recognizing individual veterans,
9   with room for over a thousand more.  The plaques contain personal information, pictures,
10  and symbolic elements (both religious and secular) and are installed at a substantial cost to
11  the purchasers.  The religious imagery on the plaques includes crosses, the Star of David,
12  and emblems of other religions.  Adjacent sidewalks invite visitors to view the plaques up
13  close. Other additions to the memorial include brick paving stones commemorating veterans
14  and supporters, and twenty-three bollards honoring community and veterans' organizations,
15  encircling the walls.  Finally, an American flag now flies from a large flagpole at the
16  memorial.

17       In 2004, Congress passed a resolution recognizing the Mt. Soledad site as a national
18  veterans' memorial, and agreeing to accept the property if the City of San Diego chose to
19  donate it to the federal government.  Public Law 108-447, 118 Stat. 2809, 3346 (2004).
20  Congress' offer was apparently motivated by its desire to end the litigation over the presence
21  of the cross that had dragged on in both state and federal courts since 1989.  The City's
22  attempt to donate the property was blocked in 2005 by a California Superior Court judge.
23  *See Paulson v. Abdelnour*, 145 Cal. App. 4th at 415.  Then in 2006, while the superior
24  court's decision was on appeal,[6] Congress exercised its takings power to acquire the site as

25  

26  national triangulation control network, and both private and public-entity surveyors frequently
    use it as a landmark for surveying purposes.  (Defs.' Mem. of P. & A. in Supp. of Mot. for
27  Summ. J. at 6:23–25, 6:27–7:3 (citing Decl. of Historian Alan Newell, ¶ 9).)  Aircraft and
    boats also use the easily-identified cross as a marker for navigation.  (*Id.*)

28       [6]  The ruling of the superior court was ultimately reversed in *Paulson v. Abdelnour*,
    *supra*, 145 Cal. App. 4th 400.

1   federal property to be preserved as a veterans' memorial. Public Law 109-272, 120 Stat.

2   771 (2006). Public Law 109-272 passed the House of Representatives by a vote of 349–

3   74, and the Senate by unanimous consent, and was signed into law by President Bush. The

4   statute directs the Secretary of Defense to enter into a memorandum of understanding with

5   the MSMA to maintain the property as a veterans' memorial. Other than this one general

6   directive, the law does not require the memorial to be maintained in any particular manner.

7       This Court's Establishment Clause analysis relies heavily on two recent Ninth Circuit

8   decisions, *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008) and *Buono v. Kempthorne*,

9   527 F.3d 758 (9th Cir. 2008) (amending earlier opinion at 502 F.3d 1069, and denying

10  rehearing en banc), and on the Supreme Court's rulings in *Van Orden v. Perry*, 545 U.S. 677

11  (2005) and *McCreary County v. ACLU*, 545 U.S. 844 (2005), on which the two Ninth Circuit

12  rulings relied.

13      **A.      Standing**

14      As a preliminary matter, the Court must determine whether Plaintiffs have standing

15  to bring this lawsuit, more precisely whether they can show they have suffered actual injury

16  owing to the presence of the cross on public land. At oral argument, counsel for the

17  Congressional *Amici* disputed that Plaintiffs have been injured and asserted they lack

18  standing. In Establishment Clause cases, standing requirements are at their nadir.[7]

19      Jewish Veterans claims associational standing. To establish associational standing,

20  "the entity must show that (1) at least one of its members would have standing to sue in his

21  own right, (2) the interests the suit seeks to vindicate are germane to the organization's

22  purpose, and (3) neither the claim asserted nor the relief requested requires the participation

23  of individual members." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06

24

25      [7] While psychological harm may sometimes be sufficient to confer Article III standing,
    *see Hudson v. McMillian*, 503 U.S. 1, 16–17 (1992) (Blackmun, J., concurring in the
26  judgment) (citing cases), offense taken at government complicity in religion is not ordinarily
    adequate. *Hein v. Freedom from Religion Foundation, Inc.*, 127 S. Ct. 2553, 2578 (2007)
27  (Scalia, J., concurring in the judgment) (quoting *Valley Forge Christian College v. Americans
    United for Separation of Church and State,* 454 U.S. 464, 485–86 (1982)). But differentiating
28  acts and conditions that are merely disquieting or annoying from those that are
    psychologically harmful, or attempting to gauge the intensity of others' subjective feelings
    are not determinations susceptible to bright-line rules.

(9th Cir. 2006). Jewish Veterans easily meets prongs two and three of this test, and has submitted the declaration of one of its members, Maurice Eis, to establish the first prong. (JV Mem. of P. & A. in Supp. of Mot. for Summ. J. ("JV Memo") at 20:19–21:4.) Mr. Eis states he enjoyed frequently visiting the memorial on Mt. Soledad, regardless of the presence of the cross, until the site was designated as a veterans memorial (presumably in 2006). (Eis Decl., ¶ 10.) At that point, he says he stopped coming to the site because he felt the memorial did not represent him: "I do not know if it is a Christian monument, but it does not speak for me." (*Id.*, ¶ 11.)

The injury claims of the individual plaintiffs are to the same effect. For example, Plaintiff Trunk says he is offended by the memorial because it "sends a message that only Christian war veterans are being honored or remembered." (Trunk Compl. at 2:25–26.) Because he feels offended, he does not enjoy the memorial. (*Id.* at 3:2–5.)[8]

If Plaintiffs' claims were based on any theory other than violation of the Establishment Clause, they would likely be out of court for lack of standing. Visitors to Mt. Soledad are, after all, mere "[p]assersby . . . free to ignore [the memorial], or even to turn their backs, just as they are free to do when they disagree with any other form of government speech." *Allegheny*, 492 U.S. at 664 (Kennedy, J., concurring in judgment in part and dissenting in part). In the Ninth Circuit, however, merely being ideologically offended, and therefore reluctant to visit public land where a perceived Establishment Clause violation is occurring, suffices to establish "injury in fact." *Buono v. Norton*, 371 F.3d 543, 546–47 (9th Cir. 2004) (holding that plaintiff, a practicing Roman Catholic who was ideologically offended by the government's decision to maintain a cross on public land, but not offended by the cross itself, had Article III standing because his opposition to the government's action led him to avoid the area where the cross was located); *Ellis*, 990 F.3d at 1523 (holding that Catholic and Episcopal residents who avoided using public park where cross was located had Article III standing to challenge its presence, because their disagreement with or embarrassment

---

[8] Similar declarations were filed by Richard Smith, Mina Sagheb, and Judith Copeland. (Decl. of Richard Smith, ¶¶ 3, 4; Decl. of Mina Sagheb, ¶¶ 3, 4; Decl. of Judith Copeland, ¶¶ 2–4.)

by the government's action prompted them either to avoid the area where the cross was located or to lessen their contact with it)*; Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 784–85 (9th Cir. 2008) (holding lesbian and agnostic parents had suffered injury in fact because they disagreed with Boy Scouts' religious and moral position and therefore avoided recreational park facilities used by Boy Scouts).

Bound by these precedents, the Court concludes all Plaintiffs have standing to bring this lawsuit.

**B.     Establishment Clause Analysis**

The government's use of religious symbolism violates the Establishment Clause if it has the purpose or effect of endorsing religious beliefs, or favoring one religion over others. The Supreme Court has used two tests to evaluate governmental interaction with religion. The older of the tests, and the one Plaintiffs urge the court to apply, was established in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).  To satisfy the Constitution under the three-part *Lemon* test, the government action 1) must have a secular purpose; 2) may not, as its principal or primary effect, either advance or inhibit religion; and 3) must not foster an excessive government entanglement with religion. *Lemon*, 403 U.S. at 612–13. The *Lemon* test was recently applied in *McCreary* to a challenge to the presence of a Ten Commandments display in a county courthouse.  Although the Supreme Court has opined that *Lemon* is not particularly useful in evaluating passive monuments, *Van Orden*, 545 U.S. at 686, this Court agrees with Jewish Veterans the test is implicated here.

The second test, taken from *Van Orden*, has been applied to passive monuments on public property.  Under the *Van Orden* test, the court determines whether the contested symbol or monument is among the "plainly religious displays that convey a historical or secular message in a non-religious context." *Card*, 520 F.3d at 1016.  If so, the display passes constitutional muster.  While it may not be spot-on to describe the Mt. Soledad memorial, viewed as a whole, as a "plainly religious display," the memorial does contain as one of its prominent elements a universally-recognized religious symbol — the Latin cross.
/ / /

1  And because the significance and effect of the cross as part of the memorial are precisely

2  what Plaintiffs complain about, this Court finds the *Van Orden* test is also implicated.

3          Which test should be used to judge the constitutionality of the Mt. Soledad Veterans

4  Memorial?  The answer is informed by the Ninth Circuit's recent decision in *Card*.  *Card*

5  attempted to harmonize the three-part *Lemon* test applied in *McCreary* with the more

6  generally-worded *Van Orden* test.  *Card* held the *Lemon* test remains the general rule for

7  determining whether the Establishment Clause has been violated.  520 F.3d at 1016.  But

8  *Card* also held *Lemon* is not to be used to evaluate the constitutionality of "some

9  longstanding plainly religious displays that convey a historical or secular message in a non-

10 religious context."  *Id.*  As to this category of display, *Van Orden* presumably applies.  *Id.* at

11 1016–17.  Adding to the puzzle, *Card* acknowledges *Van Orden* carved out a narrow

12 exception for certain Ten Commandments monuments, *id.* at 1018, but also suggests

13 *Van Orden* is not limited simply to displays of the Ten Commandments.  *See id.* at 1016

14 (referring to "plainly religious displays").  Whether a monument like the one in this case

15 comes within the *Van Orden* exception is not clear; *Card* dealt only with a Ten

16 Commandments display, and the opinion reflects uncertainty as to the breadth of the

17 exception.  *Id.* at 1018.

18         Guided by *Card*, this Court concludes the proper approach is to analyze the

19 Mt. Soledad memorial under both the *Lemon* and *Van Orden* tests, then "exercise . . . legal

20 judgment to determine whether [the memorial] passes constitutional muster."  520 F.3d at

21 1017.  That is, the Court must determine under *Lemon* whether Public Law 109-272 had a

22 religious purpose, whether the continuing presence of the cross as part of the memorial has

23 the effect of advancing religion or favoring one religion over others, and whether maintaining

24 the memorial as public property fosters excessive government entanglement with religion.

25 To pass the *Lemon* test, all three questions must be answered "no."

26         Alternatively, the Court must evaluate under *Van Orden* whether the presence of the

27 cross as part of the memorial transforms the overall character of the memorial into a "plainly

28 / / /

religious display," and if so, whether the display "convey[s] a historical or secular message in a non-religious context." 520 F.3d at 1016.

### 1. *McCreary County v. ACLU* (the *Lemon* Test)

This case dealt with large framed copies of an abridged text of the King James version of the Ten Commandments hanging in the courthouses of two Kentucky counties. Originally, no other elements were included in the displays. But after a First Amendment challenge was raised, county officials twice ordered the displays to be augmented with other secular texts. 545 U.S. at 850, 853–56. The Supreme Court found the counties' belated efforts to add secular material were designed to disguise the true objective of the displays all along — to promote the Christian religion. *Id.* at 854–55, 871–73. The Court applied the *Lemon* test and found a plainly religious purpose. *Id.* at 862.

Plaintiffs liken this case to *McCreary*, pointing out all the additional features of the memorial (flagpole and flag, walls, plaques, bollards, paving stones) were added after a legal challenge to the presence of the cross was first brought in 1989. But Mt. Soledad did not become federal property until 2006, and by then all of the changes were in place. Whatever the reasons for the changes made to the memorial by the MSMA and permitted by the City of San Diego beforehand, it is neither logical nor proper to impute the motivation for them after-the-fact to Congress. *Capital Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 764 (1995) (rejecting argument that activities of outsiders should be attributed to the government defendant as having "no antecedent in our jurisprudence"); *see also Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975–76 (9th Cir. 2004) (holding religious use of historical site by others was not attributable to the federal government).

Nor is this case, as Plaintiffs alternatively urge, like that hypothetically described in *Allegheny*, where the government had a choice of two methods of promoting a secular purpose and chose the religious one. 492 U.S. at 618 (citing *Abington School District v. Schempp*, 374 U.S. 203, 295 (1963) (Brennan, J., concurring)). Historic sites and monuments are not fungible, and the government's choices are limited to taking history as it finds it, or rejecting it. No equally historic memorial was available here as a third choice.

1    Consequently, for Plaintiffs to prevail on their Establishment Clause claim they must

2    show either that Congress acted unconstitutionally when it acquired the memorial, or that the

3    federal government is violating the Constitution by preserving and maintaining the memorial

4    in its present condition.

5

6    **a.    Did Congress Act With Secular Purpose
       When It Acquired The Memorial**?

7    Government action fails the secular purpose test only when it is clear the statute or

8    activity is "motivated wholly by religious considerations." *Lynch v. Donnelly*, 465 U.S. 668,

9    680 (1984) (citing *Stone v. Graham*, 449 U.S. 39, 41 (1980) (further citations omitted)). On

10   the other hand, it is not enough to simply identify a secular purpose in the abstract; the Court

11   must be convinced the government's secular purpose is bona fide, and not merely a sham

12   or secondary to a greater religious objective. *McCreary*, 545 U.S. at 864.

13   For the United States to recognize the service and sacrifice of its war veterans by

14   preserving a memorial in their honor is laudable and unquestionably secular. Plaintiffs are

15   skeptical this was the real impetus for Public Law 109-272, and they urge the Court to look

16   beyond the ostensible purpose. (JV Memo at 40:11–20.) Congress took the site, Plaintiffs

17   say, not to preserve it as a veterans' memorial but because of political pressure inflamed by

18   local religious and city leaders who didn't want the cross removed from the memorial. (JV

19   Memo at 36:21–23 ("The story leading to the federal taking and display of the Cross confirms

20   the facially obvious religious purpose of the federal government's actions.")) Though this

21   Court dismissed Plaintiff Trunk's claim to invalidate the land transfer, the reasons for the

22   taking remain relevant to the purpose analysis.

23   Plaintiffs focus heavily on voluminous selected evidence showing, unsurprisingly, that

24   Christian leaders and groups spoke out vehemently against removing the cross, and urged

25   the federal government to take the property instead.[9] As Plaintiffs see it, all of the prior

26

27        [9] The qualification "selected" is important because Defendants cite uncontested
     evidence that a wider spectrum of society and political leaders also favored leaving the cross
28   on the memorial site. (*See, e.g.*, Defs.' Memo at 6:4–8, citing Cong. Rec. H5423 (letter from
     Philip L. Thalheimer, stating that "As a practicing Jew, I am pleased to offer you the full

1   actions of the City and the MSMA, as well as the motives and involvement of particular

2   lobbyists, activists, and community leaders are relevant to show Congress' true purpose.

3   　　　What we see often depends on what we look for.  While the public debate over the

4   memorial informs the Court's general analysis, *Santa Fe Independent School Dist. v. Doe*,

5   530 U.S. 290, 315 (2000) (holding courts must be mindful of the circumstances in which

6   legislation was enacted), it provides no direct insight into Congress' motive.  The most the

7   Court can deduce from Plaintiffs' evidence that religious lobbying, appeals to government

8   officials, public speeches (both religious and otherwise), public prayer, and various other

9   forms of protected activities were occurring up to the time Public Law 109-272 was enacted

10  is that much of the support for the statute was religiously motivated.  This is unremarkable;

11  lobbying and public advocacy by religious and charitable organizations is altogether

12  common, *Walz v. Tax Comm'n of City of New York,* 397 U.S. 664, 670 (1970); *see also, e.g.*,

13  *United States v. Bichsel*, 395 F.3d 1053, 1054 (9th Cir. 2005) (Catholic priest and members

14  of his congregation engaged in prayer vigil and demonstration against the Iraq war), and in

15  any event cannot be regarded as "causing" Congress to take the memorial.  *Paulson v. City*

16  *of San Diego*, 475 F.3d 1047, 1048–49 (9th Cir. 2007); *Chem. Producers & Distribs. Ass'n*

17  *v. Helliker*, 463 F.3d 871, 879 (9th Cir. 2006) ("Lobbying Congress or a state legislature

18  cannot be viewed as 'causing' subsequent legislation . . . . Attributing the actions of a

19  legislature to third parties rather than to the legislature itself is of dubious legitimacy, and

20  cases uniformly decline to do so.")

21  　　　Moreover, most of Plaintiffs' evidence focuses on local activity and local advocacy in

22  favor of preserving the memorial and the cross.  While this may be relevant to evaluating the

23  possible motives of a few local members of Congress, it has no bearing on the motives or

24  purposes of Congress as a whole, which is the proper inquiry here.  Rather than trying to

25  　

────────────────

26  support of San Diegans for the Mt. Soledad National War Memorial and any further
    necessary assistance in preserving this sacred monument on behalf of the people of
27  San Diego and the United States of America.")）  And while Public Law 109-272 received
    outspoken support from local Members of Congress, as Plaintiffs point out, it was also
28  strongly supported by California's two senators, Dianne Feinstein and Barbara Boxer.  152
    Cong. Rec. S8364-01.

divine Congress' motive from the fractious public debate over whether to "save the cross," this Court will instead concentrate on objective evidence. As the Supreme Court has explained, "The eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *McCreary*, 545 U.S. at 862 (quoting *Santa Fe*, 530 U.S. at 308) (internal quotation marks and further citations omitted).

The text of Public Law 109-272 is especially relevant because it includes Congress' special findings supporting its desire to preserve the Mt. Soledad memorial, as well as an explicit statement of purpose. Among its findings, Congress recognized the (then) 52-year history of the memorial, Pub. L. 109-272 § 1(1), as illustrative of our nation's "long history and tradition of memorializing members of the Armed Forces who die in battle with a cross or other religious emblem of their faith." *Id.* at § 1(3). Regarding the design of the memorial, Congress found that the memorial cross was "fully integrated" as the centerpiece of the "multi-faceted" veterans' memorial "that is replete with secular symbols." *Id.* And characterizing the site as "a historically significant national memorial," *id.* at § 1(5), Congress found "the patriotic and inspirational symbolism of the Mt. Soledad Veterans Memorial provides solace to the families and comrades of the veterans it memorializes." *Id.* at § 1(4)–(5).

Congress' findings are facially non-religious, and relate logically to the law's secular statutory purpose — honoring our country's fallen war veterans by "preserv[ing] a historically significant war memorial." *Id.* at § 2(a). The only arguably religious references in the text are to the cross and to religious symbols as grave markers. But even those references have to do with commemorating the dead, rather than promoting any religious purpose. Furthermore, the statute is not directed to the cross *per se,* nor does it require the continued presence of the cross as part of the memorial; it simply requires the Mt. Soledad **site** be maintained as a veterans' memorial.[10] In this respect, Public Law 109-272 is quite unlike the

---

[10] If in the future, for example, the cross becomes structurally unsound and must be removed for safety reasons, the statute does not require that it be replaced.

challenged legislation in *Buono,* which was specifically aimed at protecting "a five-foot-tall white cross." *See Buono*, 527 F.3d at 769 n.3, 770. Courts may not lightly impute impermissible motives to the legislative and executive branches, *Stenberg v. Carhart*, 530 U.S. 914, 1008 n.19 (2000) ("We do not assume unconstitutional legislative intent even when statutes produce harmful results . . . .") (citations omitted); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution."), and this Court, in particular, does not share Plaintiffs' cynical assumption that a commanding majority of the House of Representatives and the entire U.S. Senate didn't mean what they said.[11]

Legislative history also informs whether a statute has secular purpose. This includes the history and implementation of the bill, as well as any relevant circumstances related to its passage, such as timing. With little debate, Public Law 109-272 passed by an overwhelming vote in the House of Representatives and by unanimous consent in the Senate. President Bush then promptly signed the bill into law. This Court considers the relatively uncontroversial history of the bill and the wide margin by which it passed in both houses of Congress as important additional indicators of its secular purpose. Congress is a large, heterogeneous body consisting of members of different religious faiths and, in some cases, no faith at all. *See Religions in the 109th*, CQ TODAY, Nov. 4, 2004, at 63; Jonathan Tilove, *Diversity Under the Dome*, CHURCH & STATE, Feb. 1, 2007, at 8. It is unlikely such a diverse group would unite to support religious legislation cloaked with a secular agenda, particularly legislation as insular as Plaintiffs suggest.

---

[11] Plaintiffs point to cases where courts inferred illicit legislative motives, *see, e.g. McCreary*, 545 U.S. at 862 (county governments); *Edwards v. Aguillard*, 482 U.S. 578, 586–90 (1987) (state legislature); *Wallace v. Jaffree*, 472 U.S. 38, 57–58 (1985) (state legislature); *Stone,* 449 U.S. at 41(state government)*,* but these were state and local legislatures and government entities, not Congress.

And paying heed to the presumption that Congress acts constitutionally, *Rostker v. Goldberg,* 453 U.S. 57, 64 (1981); *Kong v. Scully,* 341 F.3d 1132, 1137 (9th Cir. 2003), it is reasonable to assume the bill would have attracted fierce debate and significant opposition had legislators perceived preserving the memorial was a ploy to disguise a religious purpose. While Plaintiffs offer snippets of evidence showing individual legislators made isolated statements arguably suggesting their own religious motives for supporting the bill, (JV Memo at 13:2–7, 42:1–10 and n.30; JV Mem. of P. & A. in Supp. of Opp'n. to Mot. for Summ. J. ("JV Opp'n") at 28:3–6), there is simply no evidence that Congress **as a whole** was so motivated. Even so, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002) answers this point:

> Floor statements from two Senators cannot amend the clear and unambiguous language of a statute. We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text.

*See also Board of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 249 (1990) (explaining even if some legislators were motivated by a purpose to favor religion, that would not invalidate the legislation "because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law").[12]

The timing of the bill is also noteworthy. The enactment of Public Law 109-272 followed on the heels of Justice Kennedy's highly unusual order staying the injunction of a court of this District that would have required removal of the cross from the memorial. *San Diegans for Mt. Soledad Nat'l War Memorial v. Paulson*, __ U.S. __, 126 S. Ct. 2856 (2006). This Court presumes Congress was aware of Justice Kennedy's order, *see Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 683–84 ("[W]e presume that Congress is aware of the legal context in which it is legislating.") (citations omitted), which signaled the view that at least four members of the Supreme Court did not necessarily believe (as previous

---

[12] In their brief, the 33 Congressional *Amici* take pains to separate themselves from individual legislators' remarks Plaintiffs now suggest demonstrate the thinking of the entire Congress. For reasons outlined in the text, the Court must largely ignore the statements of individual legislators respecting their own motives for either supporting or opposing particular legislation.

06cv1597

litigation might have suggested) the presence of the cross as part of the memorial violates the Establishment Clause. *See* 126 S. Ct. at 2857–58 (explaining standard for granting stay and predicting four members of the Supreme Court would vote to review decision below).

Because a series of government actions culminating in passage of legislation can serve as evidence of government purpose, courts should also examine the legislative context for other comparable acts. *McCreary*, 545 U.S. at 866. Here, the only previous action by Congress was its designation of the site as a veterans' memorial, and its offer to accept the site, should the City of San Diego choose to donate it to the federal government. Congress' entreaty to the City followed years of litigation over the presence of the cross, and numerous unsuccessful efforts by City officials and voters to resolve the issue. Congress later cited the interminable litigation and the City's frustrated efforts to settle the controversy in its findings supporting taking the memorial. Pub. L. 109-272, § 1(6)–(7).

Plaintiffs infer a religious motive from Congress' expression of dissatisfaction with the protracted litigation, and what it apparently perceived as the undemocratic intervention of the state superior court invalidating a runaway vote by San Diego citizens in favor of donating the memorial to the federal government.[13] But Congress is certainly entitled to criticize or disagree with state law, and may freely seek to avoid or override it. *See Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) (explaining Congress may override state law when it stands as an obstacle to the full purposes and objectives of Congress in enacting federal legislation) (citing *Hines v. Davidowitz*, 312 U.S. 52, 61 (1941)).[14] Here, all of the litigation preceding the enactment of Public Law 109-272 had questioned the constitutionality

---

[13] The Congressional *Amici* particularly associate themselves with this stated purpose:

Like all democratically-elected bodies, Congress has a great interest in giving effect to the will of the people on issues of public importance. The widespread support among San Diego voters for the federal government's operation of the Memorial cut across religious, political, and cultural lines.

(Brief of Congressional *Amici* at 4:16–20.)

[14] In any event, criticism of state law, even a law relating to religion, is a non-religious purpose. *See Mergens*, 496 U.S. at 249 (holding that Congressional purpose to prevent discrimination against religious speech was "undeniably secular").

06cv1597

1   of the Mt. Soledad memorial under the California constitution, whose "No Preference" clause

2   is significantly more restrictive than the U.S. Constitution's Establishment Clause. *See*

3   *American Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1123 (9th

4   Cir. 2002); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1402 (9th Cir. 1994).[15]   It was within

5   Congress' prerogative to enact legislation that would effectively require resolution of the

6   lingering issues under the federal Constitution.

7   In sum, the Court's close, objective scrutiny of the record turns up no persuasive

8   evidence Congress meant to advance religion or favor a particular religion when it acquired

9   the Mt. Soledad memorial.  Just the opposite, it readily appears Congress acted with the

10  clear-cut and bona fide secular purpose to preserve the site as a veterans' memorial.  The

11  "purpose" prong of the *Lemon* test is met.

12

13  **b.    Does Maintaining The Cross As Part Of The Memorial Have The Effect Of Advancing Religion?**

14  *Lemon* next asks whether government action has the principal or primary effect of

15  either advancing or disapproving of religion. *Lemon*, 403 U.S. at 612.  An action advances

16  religion if it conveys a message that religion or particular religious beliefs are preferred.

17  *Allegheny*, 492 U.S. 593.  The question here is whether viewers of the Mt. Soledad memorial

18  would fairly understand the continuing presence of the cross as a message the federal

19  government favors religion, and in particular the Christian religion. *See id.* at 595. The

20  question is to be analyzed from the point of view of an intelligent, well-informed "reasonable

21  observer," who represents both Christians and non-Christians, *id.* at 620, and is "aware of

22

23  _____

    [15] *Compare, e.g., Access Fund v. U.S. Dep't. of Agriculture*, 499 F.3d 1036, 1044 (9th

24  Cir. 2007) (deeming federal protection of religious sites — even those sites in active use — Constitutional), with *Frohliger v. Richardson*, 63 Cal. App. 209, 217 (Cal. App. 1 Dist. 1923)

25  (holding California constitution forbids public maintenance of California's missions, in spite of their obvious historic significance).  In contrast to what the Establishment Clause permits,

26  as explained in *Access Fund*, California's stringent "No Preference" clause would presumably prevent the state from protecting or maintaining in any way a historical religious

27  site or edifice that happened to be located on state property.  And the rule urged by Plaintiffs would render automatically suspect the federal government's decision to take such sites in

28  order to preserve them.  The effect would be unwarranted interference by the federal courts with Congress' power to take property for public use, as well as the needless loss of cultural
    and historical resources.

the history and context of the community and forum in which the religious display appears." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995). A reasonable observer would be aware of the uncontested facts recited above.

Two additional ground rules guide the effect analysis. First, the Supreme Court has stressed that individual elements of monuments and memorials should not be considered in isolation, because to do so would always result in a finding of unconstitutionality. *Lynch*, 465 U.S. at 679–82 ("Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause.") Justice Kennedy's order in *Paulson* emphasizes this point, referring throughout to the memorial as a whole, and not to the cross in isolation. *See, e.g., Paulson*, 126 S. Ct. at 2856–57. *See also Van Orden*, 545 U.S. at 701 ("[T]o determine the message that the [religious] text here conveys, we must examine how the text is *used*. And that inquiry requires us to consider the context of the display.") (Breyer, J., concurring in the judgment). In this respect, this case differs markedly from earlier cases like *Buono* and *Separation of Church and State Comm. v. City of Eugene*, 93 F.3d 617, 619 n.2 (9th Cir. 1996), where each memorial consisted exclusively of a cross marked with a plaque.[16]

Second, in assessing the Mt. Soledad memorial, the Court must be mindful of its responsibility to avoid evincing a hostility to religion. *Van Orden*, 545 U.S. at 683–84 (plurality opinion); 704 (Breyer, J., concurring in the judgment). Because this responsibility is just as great as the duty to guard against advancing religion, *id.* at 683–84, the Court should not indulge any presumption in favor of either retaining or removing the cross. *Van Orden*, *Card* and other cases prove that at least some monuments with religious elements are permissible, *see* 545 U.S. at 689 (noting, with approval, "a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court

---

[16] Plaintiffs also cite other cases in which crosses designated as monuments were found to have violated California law. *See, e.g., Ellis*, 990 F.2d 1518. Because the federal government is not subject to state law, and California law is much more restrictive than federal law in this area, these cases are not binding nor are they particularly persuasive.

1    for the District of Columbia"), and the Court must take care to evaluate the memorial here

2    in its particular physical setting and according to its own unique circumstances. *Allegheny*,

3    492 U.S. at 595 (citing *Lynch*, 465 U.S. at 694). The inquiry demands a sense of proportion

4    and is fact-sensitive.

5          Plaintiffs rely on *Buono* to support their initial argument that displays with crosses

6    ought to be analyzed differently from displays with other religious symbols or texts. They

7    suggest the Court need not engage in a detailed analysis of the evidence, but should simply

8    conclude the Latin cross necessarily conveys an exclusively religious message. (JV Opp'n

9    at 24:8–16. ("[C]ourts have invariably found that the Latin cross is a Christian symbol."))[17]

10   But unlike *Buono*, where no one apparently disputed that the cross is **exclusively** a Christian

11   symbol, here it **is** disputed. *Cf. Buono*, 527 F.3d at 769. And, contrary to Plaintiffs'

12   suggestion, precedents dealing with public displays of crosses in the Establishment Clause

13   context suggest Latin crosses should **not** be assumed to be primarily or exclusively religious

14   symbols. *See Pinette*, 515 U.S. at 770 (Thomas, J., concurring) (observing that erection of

15   a cross could be a "a political act, not a Christian one")*; City of Eugene*, 93 F.3d at 626 n.12

16   (O'Scannlain, J., concurring) ("While a crucifix is an unmistakable symbol of Christianity, an

17   unadorned Latin cross need not be.") (citing *Lynch*, 465 U.S. at 676 (further citation

18   omitted)). *See also Weinbaum v. Las Cruces Public Schools*, 465 F. Supp. 2d 1182,

19   1192–93 (D.N.M. 2006) (holding that a cross could have both religious and secular meaning)

20   (citing *Van Orden*, 545 U.S. at 690–91; *American Atheists, Inc. v. Duncan*, 528 F. Supp. 2d

21   1245, 1253 (D.Utah 2007) (rejecting suggestion that "the stand alone Christian crosses"

22   installed by the sides of roadways in memory of fallen highway patrolmen were, "as a matter

23   of law, exclusively religious symbols").

24         The Latin cross is, to be sure, the preeminent symbol of Christianity, but it does not

25   follow the cross has no other meaning or significance. Depending on the context in which

26   it is displayed, the cross may evoke no particular religious impression at all. A current

27

28         [17] Jewish Veterans modified their stance somewhat at oral argument, conceding the Argonne Cross and Canadian Cross of Sacrifice at Arlington National Cemetery did not convey an exclusively religious message and did not violate the Establishment Clause.

06cv1597

example makes the point. Veterans for Peace is a national organization of military veterans who oppose the war in Iraq. Each weekend, the anti-war group organizes well-publicized exhibits on public beaches and in public parks erecting thousands of crosses to represent the number of U.S. military dead in Iraq. *See, e.g*, Bruce V. Bigelow, *Beach Exhibit Calls Attention to Fallen*, SAN DIEGO UNION-TRIBUNE, Nov. 11, 2007, at N1, *available at* http://www.signonsandiego.com/uniontrib/20071111/news_1mc11crosses.html and http://photos.signonsandiego.com/gallery1.5/album48/year09 (photographs of recent exhibits in San Diego County); Michael R. Blood, *Memorial Can't Keep Pace With War Dead*, Associated Press, Dec. 12, 2006, *available at* http://www.msnbc.msn.com/id/16177168/from/RS.3/ (as *It's Getting Out of Hand/Volunteers at California Beach Memorial Can't Keep Pace With Iraq War Toll*). In the anti-war context of the displays, the crosses alternatively symbolize the cost of war, sacrifice and honor, and repose in death — specifically, military death. But the objective observer perceives no obvious or explicit religious message in the displays. Jewish Veterans' able counsel acknowledged this point at oral argument, but maintained that any display containing a Latin cross is inherently religious because "[i]f there is a . . . quasi-secular message that the cross communicates, it is a message that has resonance only by virtue of its derivation from Christian doctrine." (Tr. of Oral Argument at 17:19–21.)

Under Plaintiffs' analysis, no idiom is safe. In other words, a religious allusion or symbol could never be used to convey a secular meaning, as Plaintiffs see it, because any such reference would necessarily rely on underlying religious belief or doctrine. How then does one explain the result in *Van Orden*, where the monument's clear reference to the Ten Commandments received by Moses on Mt. Sinai as described in the book of Exodus was determined to have secular import? *See* 545 U.S. at 700 (emphasizing the text of the Ten Commandments "undeniably has a religious message, invoking, even emphasizing, the Deity.") (Breyer, J., concurring). Or in *Lynch,* where a city was permitted to erect and display a crèche? 465 U.S. at 687 ("We hold that, notwithstanding the religious significance of the crèche, the City of Pawtucket has not violated the Establishment Clause of the First

Amendment.")  Or in *Allegheny*, where a menorah was allowed to stand outside a public building? 492 U.S. at 613 ("The menorah, one must recognize, is a religious symbol:  it serves to commemorate the miracle of the oil as described in the Talmud.  But the menorah's message is not exclusively religious.")  The answer must be that, depending on the context and the particular physical setting, a symbol that is ordinarily seen as religious can convey an ancillary secular message.

Consideration of other religious structures and sites supported by federal funds and protected by federal law — such as cathedrals, synagogues, and churches — buttresses this conclusion.  The National Cathedral in Washington, D.C.; the Touro synagogue, America's oldest standing synagogue, dedicated in 1763; the Sixteenth Street Baptist Church in Birmingham, Alabama, a landmark of the civil rights movement in the United States; and the Old North Church in Boston, Massachusetts, where two lanterns warned of the impending British advance — all have religious origins and are in active use as religious sites, but are also recognized secular cultural and historic landmarks.  See *Access Fund*, 499 F.3d at 1044 (noting "secular motivations" lay behind government protection of various religious sites, including the National Cathedral, the Touro Synagogue, and numerous churches).  That these familiar national landmarks were first recognized and are perhaps still seen as primarily religious sites neither abrogates their secular symbolism nor renders them "off limits" to government support.  Similarly, that the Mt. Soledad memorial includes a cross as one of its elements and has been used as the site of religious services — however frequently — does not by itself strip it of any wider social or historical meaning or prevent the federal government from being involved with the property.  *Access Fund*, 499 F.3d at 1044; *Cholla Ready Mix*, 382 F.3d at 976.

While the cross is the tallest and highest element in the memorial and, it is uncontested, the most visible from a distance, it is not the largest.[18]  Nor are the other

_____

[18] The size of a cross or other symbol, in absolute terms, is not dispositive.  Relatively large crosses and other displays can be permitted to stand on public property, such as the 24-foot Canadian Cross of Sacrifice at Arlington Plaintiffs agree is Constitutionally permissible or the 12-foot roadside crosses at issue in *Duncan*.  On the other hand, fairly

- 20 -                                                                    06cv1597

1  elements of the memorial insubstantial.  The various photographs submitted as evidence by

2  the parties show the cross takes on a greater or lesser degree of prominence depending on

3  viewing conditions and angle.    Both parties have submitted evidence showing,

4  unsurprisingly, that experts reached different conclusions regarding the overall effect of the

5  memorial.

6      Plaintiffs' principal evidence on this point consists of declarations by art historian

7  Lawrence Nees, Ph.D., and historian G. Kurt Piehler, Ph.D.  Dr. Nees provides a long history

8  of the use of the cross as a Christian symbol, a fact Defendants do not contest.  Dr. Piehler

9  provides a history of American war monuments and memorials.  He recounts the federal

10  government's increased interest in building war memorials following World War I, noting

11  Congress vested responsibility for overseas military cemeteries in the American Battle

12  Monument Commission, which oversaw the completion of cemeteries and monuments.

13  (Piehler Decl. in Supp. of Mot. for Summ. J., ¶ 14.)  In these cemeteries, the cross was

14  adopted as the default gravestone.  (*Id.*, ¶¶ 25, 26.)[19]  While recognizing American war

15

16  small crosses or other symbols have been struck down, including a sign containing a 4-inch-
   high crucifix, *Granzeier v. Middleton*, 955 F. Supp. 741, 743, and n.2, 746–47 (E.D.Ky.
17  1997), *aff'd on other grounds*, 173 F.3d 568, 576 (6th Cir. 1999).

18      [19] Dr. Piehler's declaration implicitly recognizes the generic use of crosses as grave
   markers, particularly for the graves of fallen service members.  This concept is also well-
19  attested to in literature, cinema and the visual arts.

20      One example is John McCrae's poem "In Flanders Fields," commemorating the allied
   military dead of World War I and memorized by several generations of schoolchildren:
21

22      In Flanders fields the poppies blow
       Between the crosses, row on row,
       That mark our place . . . .
23      We are the dead.

24      The opening and final scenes of a popular recent movie, SAVING PRIVATE RYAN
   (DreamWorks SKG 1998), provide another example, depicting the Normandy American
25  Cemetery and Memorial where seemingly endless rows of crosses (and occasional Stars of
   David) mark the graves of American servicemen who died in the D-Day invasion.
26

27      A final example is John Atherton's famous World War II poster A CARELESS WORD
   (OWI Poster No. 23) (U.S. Government Printing Office, 1943) (*available at* Posters of the
28  Second World War in the Kittleson Collection at the Minneapolis Public Library,
   https://www.mplib.org/wpdb/index.asp?exact=MPW00497).  The poster depicts a soldier's
   helmet and ammunition belt hanging from a cross planted in desert sand, with the motto "a

1    memorials sometimes include religious symbols, Dr. Piehler concludes most do not focus

2    on religious imagery.  (*Id.*, ¶ 18, 19, 21, 23, 29, 30.)

3         Dr. Piehler acknowledges two of the war memorials mentioned by the dissent in

4    *Buono*, 527 F.3d at 765 n.6, the Argonne Cross and the Canadian Cross of Sacrifice, both

5    at Arlington.  He describes the Argonne Cross as part of a larger display dedicated to

6    servicemen who died in the campaign for the Argonne Forest. (Piehler Decl. in Supp. of Mot.

7    for Summ. J. at 12:19–22.)  Apparently, he is referring to the grove of trees in which the

8    cross is located.[20]  He does not provide a description of the Canadian Cross of Sacrifice,

9    dedicated to the memory of American citizens who served in the Canadian armed forces

10   during World Wars I and II and the Korean War.[21]  Notwithstanding these two prominent

11   crosses at Arlington, Dr. Piehler concludes the memorial on Mt. Soledad is an aberration

12   among war memorials and, in his eyes, represents an attempt to promote the Christian

13   religion.

14        Defendants in turn present evidence showing widespread use of the cross in honoring

15   military dead, and point to other examples of monuments incorporating crosses as the sole

16   or primary element.  In addition to those already cited, Defendants identify the Mexico Civil

17   War Memorial at Arlington;[22] the Irish Brigade Monument at Gettysburg National Military

18   Park; a memorial in Taos, New Mexico to American servicemen who endured the Bataan

19   Death March; and an American Legion war memorial in La Mesa, California (a few miles

20

21   careless word . . . another cross." The poster's message is one of vigilance, and the context,
     then and now, makes the cross instantly recognizable as a symbol of military death.

22

23        [20] A description of the monument and photograph are available online at
     http://www.arlingtoncemetery.org/visitor_information/Argonne_Cross.html. This photograph
     is identified in the Brief of Congressional *Amici* at 9 n.8.

24

25        [21] This memorial consists of a 24-foot granite cross adorned with a bronze sword.
     Inscriptions on the faces of the monument's base honoring those who served.  A description

26   and photograph are available online at http://www.arlingtoncemetery.org/Visitor_
     information/Canadian_Cross.html (citing James Edward Peters, *Arlington National*

27   *Cemetery: Shrine to America's Heroes* (Woodbine House 2000)). This photograph is also
     identified in the Brief of Congressional *Amici* at 9 n.8.

28        [22] A photograph of this monument is available online at http://www.arlington
     cemetery.org/images/ANC_surroundings/PAGES/image49.html.

06cv1597

from Mt. Soledad). (Decl. of Edward Linenthal, Ph.D. ¶ 24.) Defendants also cite evidence showing Latin crosses frequently appear in memorials, including war memorials, as symbols of sacrifice without reference to the religious beliefs of those whom the memorials commemorate. (Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Defs.' Memo") at 11:2–10 (citing expert evidence); *see also* Linenthal Decl. ¶ 24 (noting the cross was used to commemorate service and secondarily to symbolize sacrifice).) Plaintiffs' evidence, without elaboration, agrees the Latin cross is not invariably a sectarian symbol (Piehler Decl. in Supp. of Opp'n to Mot. for Summ. J. ¶ 7 ("Efforts to make the Cross into a unifying symbol free of sectarian association have usually failed.")

While the Court does not weigh evidence at the summary judgment stage, it is likewise not obliged to accept an expert witness's legal conclusions, particularly to the extent they conflict with governing legal standards or fail to take into account factors the Court must consider. Here, the Court finds the Piehler declaration circumscribes its focus on an individual element of the memorial — the cross — rather than looking at the memorial as a whole as the case law requires. *Allegheny*, 492 U.S. at 597; *Lynch*, 465 U.S. at 679–82. The Court also finds the Piehler declaration fails to fully consider other well-recognized meanings of the Latin cross, in particular its symbolic references to military service, sacrifice, and death.[23] By contrast, the Court must take into account both the secular and religious meanings of symbols and icons in evaluating their effect. 492 U.S. at 598–600, 613–14; 465 U.S. at 680. Because Dr. Piehler's analysis of the memorial's effect largely considers the cross in isolation and almost entirely fails to address its recognized secular meaning — which he agrees exists — his opinion is not particularly helpful to the Court's legal analysis, and to this extent must be discounted.

Context is crucial to the effect analysis, as *Allegheny* emphasized. There, a huge menorah had been placed in front of Pittsburgh's city hall. Opponents argued the display conveyed the message the city endorsed Judaism, yet the Supreme Court sustained the

---

[23] *See, e.g.,* Piehler Decl. in Supp. of Mot. for Summ. J. ¶ 6 (noting "[S]everal military medals do make use of the Cross, but nationalize them and sufficiently strip them of a sectarian character," without further attempting to explain what meaning remains).

placement because a nearby Christmas tree withdrew any reasonable implication of religious advancement or favoritism. 492 U.S. at 614, 617. The context of the Mt. Soledad memorial is similarly telling in its effect. Unlike *Buono* and *City of Eugene*, where Latin crosses standing alone were the memorials, the cross on Mt. Soledad is, as Congress accurately described it, "fully integrated" as the centerpiece of a "multi-faceted" veterans' memorial "that is replete with secular symbols." In fact, in terms of the number of elements the memorial comprises, secular symbols predominate with over two thousand individual memorial plaques, twenty-three military bollards, numerous inscribed paving stones, a tall flagpole and large American flag, and a bronze plaque commemorating the dedication of the memorial in 1954. And except for the cross, there are no other religious elements such as altars, statues, religious texts, or a chapel. When the cross is considered in the context of the larger memorial and especially the numerous other secular elements, the primary effect is patriotic and nationalistic, not religious.

The physical setting of the memorial, moreover, neither compels nor encourages religious devotion. For one thing, physical access to the cross is blocked by an iron fence. Also, there are no benches immediately adjacent to and facing the cross, nor any other fixtures or devotional trappings inviting veneration of the cross. Visitors can sit on the stairs leading up to the memorial platform, but the view from the stairs while seated is of the panorama and away from the cross. Finally, the location of the memorial makes it an unlikely venue for government indoctrination. Located away from the hub of downtown and the seat of government, Mt. Soledad park is more a destination than a way station. *Compare Van Orden*, 455 U.S. at 681 (monument located on state capitol grounds); *Card*, 520 F.3d at 1010 (monument located on sidewalk adjacent to police headquarters). Unlike other places such as public schools where student attendance is compulsory, or public buildings like courthouses, post offices, and city, county, state and federal office buildings where citizens must often enter to transact business, no one is compelled to visit the memorial.

The secular effect of the memorial as a whole is borne out by other evidence. As noted, the memorial is a popular site for ceremonies honoring veterans. Martino-Bloomfield

06cv1597

*Amici* describe a non-religious plaque-dedication ceremony at the memorial in which Captain Michael Martino and Major Gerald Bloomfield II, who were killed in action in Iraq, were honored. The photographic evidence of the heavily-attended ceremony shows attention focused on the dedication of the plaques honoring the two fallen soldiers in a solemn and patriotic fashion. (Brief of Martino-Bloomfield *Amici* Exs. 1–6.) The cross plays no noticeable role in the ceremony itself.[24] An objective observer happening upon such a ceremony would immediately perceive its patriotic and military character and meaning, and would not take away a religious message.

Finally, the venerable history of the memorial also informs the Court's effect analysis. To the objective observer who knows the background of the Mt. Soledad site, the 54-year-old veterans' memorial is an important part of San Diego history. San Diego has long been known as a "Navy town" with a strong military presence, and it retains that image and reputation today even though it is one of America's largest cities. The Court finds the objective observer, mindful of the age of the memorial and recognizing its relationship and significance to San Diego's history (especially the City's military history), would regard the federal government's decision to acquire it and leave it intact as an effort to preserve an important regional landmark. *See Cholla Ready Mix*, 382 F.3d at 976 ("The Establishment Clause does not require governments to ignore the historical value of religious sites.") In other words, the objective observer would take Congress at its word that it acquired "a historically significant national memorial" to preserve it as a place of "solace to the families and comrades of the veterans it memorializes."

Having considered all of Plaintiffs' evidence and arguments, the Court finds the Mt. Soledad Veterans Memorial passes the effect test because: the cross has a broadly-understood ancillary meaning as a symbol of military service, sacrifice, and death; it is displayed along with numerous purely secular symbols in an overall context that reinforces

/ / /

---

[24] The briefing suggests the families of the men understand the cross to be analogous to a grave marker. *Id.* at 2:17–20, 6:11–21.

its secular message; and it is historically significant.  As a result, the specter of government endorsement of religion or favoring a religion is not apparent, let alone obvious and primary.

### c.    Excessive Entanglement

Excessive government entanglement can occur when the government is required to be involved in matters such as inquiries into religious doctrine, delegation of state power to religious bodies, or detailed monitoring and close administrative contact.  *Hernandez v. Comm'r*, 490 U.S. 680, 696–97 (1989).  None of that is implicated here because, as the Court has found, the memorial does not advance religion. In any event, allowing the MSMA — a civic organization — to operate the site effectively insulates the government from any impermissible relationships. The monument clears the third prong of *Lemon*.

### 2.    *Van Orden v. Perry*

Under *Van Orden*, the Court conducts a general, fact-intensive analysis.  *Card*, 520 F.3d at 1017–18.  Much of this analysis mirrors the discussion of purpose and effect under the *Lemon* test, but it is not precisely the same.  In *Card*, the Ninth Circuit considered three factors it had gleaned from *Van Orden*: the monument's secular purpose; whether it suggested a religious or a secular message; and a historic lack of complaints.  *Id.* at 1019–21.  The plurality and concurring opinions in *Van Orden* suggest other relevant considerations, including whether the monument is located close to other government buildings (which might reinforce an inference of government endorsement), 545 U.S. at 690–91; who donated the monument, *id.* at 701–02; and whether it is passive or proselytizing in its effect.  *Id.* at 691.

### a.    Secular Purpose

The Court's discussion of Congress' purpose under the *Lemon* test applies here, and the conclusion that Congress acquired the memorial for a secular purpose is the same.  But *Card* intimates *Van Orden's* secular purpose inquiry is broader in the context of passive monuments.  That is, the Court should examine not just how government came to be involved with the monument, but should also ask whether its **continued display** implies religious purpose.  *Card*, 520 F.3d at 1013 n.5 ("[B]ecause we conclude that the City's

1  display of the monument was not motivated by a religious purpose . . . its display does not

2  violate [the state constitution.]")  Answering this question, according to *Card*, requires first

3  answering two subsidiary questions:  1) What is the actual purpose of the monument; and

4  2) What are the perceptions of that purpose by viewers?  *Id.* at 1019.

5      Reiterating an earlier finding, this Court accepts Congress' explicit statement of

6  purpose that it acquired the Mt. Soledad site "in order to preserve a historically significant

7  war memorial . . . ."  The actual purpose of the monument is, as Congress said, to inspire

8  patriotism and recognize those who died while serving our country, and to provide solace to

9  the families of the veterans it memorializes.  Because the Court has found Congress'

10  articulation of its purpose was bona fide, and not a sham to disguise ulterior religious

11  motives, the actual purpose of the memorial continues to be secular as Congress intended.

12      Less clear is how viewers perceive the purpose of the memorial.  This value-laden

13  question is difficult because an answer either way is likely to be regarded as failing to respect

14  fully religious belief or disbelief.  *Van Orden*, 545 U.S. at 696–97 (Thomas, J., concurring)

15  (observing a "[c]ourt's foray into religious meaning either gives insufficient weight to the views

16  of nonadherents and adherents alike, or it provides no principled way to choose between

17  those views.")  Any answer is also likely to implicate judicial aesthetic judgments and be

18  influenced by the judge's personal views, which might render the outcome suspect.  *Id.* at

19  697 (quoting *Harris v. Zion*, 927 F.2d 1401, 1425 (7th Cir. 1991) (Easterbrook, J., dissenting)

20  ("Line drawing in this area will be erratic and heavily influenced by the personal views of the

21  judges."))  To guard against these risks, the Court assumes (consistent with *Lemon*) it must

22  again analyze the question from the point of view of an objective, reasonable person, not

23  from the standpoint of the hypersensitive or easily offended, and must consider the overall

24  context of the memorial.

25      Two contexts are important here: the context of the memorial display itself, and the

26  memorial's overall historical context.  Mt. Soledad's memorial display consists of an

27  assortment of elements and symbols, all but one of which are indisputably secular.  The

28  cross, having both religious and secular meaning, is ensconced within and immediately

1    surrounded by the array of non-religious, military, and patriotic elements.  It is conceivable

2    that an objective observer could initially perceive a religious purpose in the display, given the

3    prominence and centrality of the cross.   But as he or she surveyed the plaque-lined

4    dedication walls, passed the military bollards, walked on the inscribed paving stones, looked

5    up at the large American flag, and read the inscription at the base of the cross declaring the

6    display to be a veterans' memorial, the initial perception of religious purpose would quickly

7    give way to a secular one.  In the eyes of the objective observer, the other elements of the

8    display would dilute the religious meaning of the cross, and reinforce its secular meaning of

9    military service and death. Considering all of the architectural elements in combination, the

10   objective observer would readily perceive the purpose of the memorial was to honor

11   veterans.[25]

12          The historical context of the memorial also supports the conclusion an informed

13   observer would perceive its secular purpose. Had the memorial been erected on or close by

14   the Camp Pendleton Marine Base, the North Island Naval Center, the Miramar Naval Air

15   Station, the Marine Corps Recruiting Depot, Fort Rosecrans National Cemetery or any of the

16   numerous other federal military enclaves in San Diego, there would be no question as to its

17   secular purpose. An objective observer, aware of San Diego's historical relationship with the

18   military, would readily recognize its purpose was to honor veterans.   The placement of a

19   display containing religious elements can signal its purpose, *Allegheny*, 492 U.S. at

20   599–600, but here there was no choice.  Congress took the memorial where it found it — a

21   fact that would be well understood by the informed objective observer aware of the history.

22   To that observer, the  memorial's fortuitous placement on Mt. Soledad fifty-four years ago

23   would not bespeak contemporary religious purpose.

24   ───────────

25         [25] This is not to disparage or discount the honest and deeply-felt offense Plaintiffs take
     at the Mt. Soledad Veterans Memorial. But the legal standard the Court must apply is an
26   objective one. That some person or group might be uncomfortable with the presence of the
     cross as part of the veteran's memorial is not enough to require its removal.   "[T]he
27   endorsement inquiry is not about the perceptions of particular individuals or saving isolated
     nonadherents from the discomfort of viewing symbols of faith to which they do not
28   subscribe."  *Pinette*, 515 U.S. at 779 (O'Connor, J., concurring).  It would be asking the
     impossible to require government to ensure no one will be offended before taking property
     containing religious elements in order to preserve it.

### b. Religious or Secular Message

To resolve the message question, the *Card* court focused on the particular setting of the monument in that case — a six-foot-tall granite block inscribed with Ten Commandments. The monument was located on a sidewalk adjacent to an old city hall building, which was in use as the city's police headquarters. 520 F.3d at 1010. About ten feet away from the monument were three eight-foot-tall granite tablets inscribed with the names of city residents who died in military service. *Id.* at 1011. Several other war-related monuments were located across the street. *Id.*

*Card* pointed out the Ten Commandments monument was the only one of the several monuments that had facially-religious significance, but at the same time rejected the notion a "quota system" determines the nature of the monument's message. *Id.* at 1020. The court also found it important the monument had no benches in front of it, and the setting did not lend itself to meditation, genuflection, or other religious activity. *Id.* at 1022.

The situation here parallels that in *Card*. Although there were additional secular monuments in the vicinity in that case, here there are additional secular elements to the memorial that in combination with the cross create a larger, multi-faceted display. The close proximity of patriotic and militarily symbolic elements to the cross is much more apt to spell out a non-religious message here than in *Card* where all but one of the other monuments were across the street. And, as in *Card*, the physical setting of the memorial — here, the inaccessibility of the cross itself and the absence of other religious trappings or closely-adjacent benches — does not readily lend itself to religious genuflection.

The Court does not ignore the uncontested evidence that religious observances and mixed religious and secular events, such as the dedication ceremony in 1954, have taken place at Mt. Soledad. Uncontroverted evidence also shows the memorial has been extensively used for non-religious events, and there is no history of religious discrimination. *Cf. Buono v. Norton*, 371 F.3d at 550 (holding a reasonable observer would be aware of religious discrimination in administering the site). The point is, however, overall, the memorial is not designed for worship services and there is no evidence the cross, which is

1   surrounded by a tall fence and not approachable by visitors, is — or is intended to be — the

2   object of religious devotion.  Understanding that deciphering the message conveyed by a

3   passive monument does not depend on tallying-up a scorecard of secular and sectarian

4   objects or elements, the Court reiterates its earlier finding and conclusion that the primary

5   effect of the Mt. Soledad memorial is patriotic and nationalistic.  This is but another way of

6   saying the message the objective observer takes away from the memorial is a secular one.

7                    **c.    History of Complaints**

8       In both *Van Orden* and *Card,* the courts examined whether there was a history of

9   complaints by citizens protesting the monument's apparent religious message.  That issue

10  must also be examined here. For purposes of the analysis, the Court will consider the history

11  of the existing cross at the memorial, rather than beginning with one of the earlier two

12  crosses.  This is the most appropriate time period in the longevity analysis since only the

13  current cross was ever officially recognized as memorializing veterans.  In any event, there

14  is no history of complaints about the other crosses.

15      From the dedication of the Mt. Soledad memorial in 1954 to the commencement of

16  litigation in 1989, no record of complaints concerning the current cross can be found.[26]  This

17  is significant to the Court's analysis because the 35-year complaint-free period here is close

18  / / /

19

20      [26] Plaintiffs attempt to shorten the span by pointing to an investigation in 1969 or 1970
    by San Diego Councilwoman Helen Cobb (JV Opp'n at 40:22–41:10).  But the
21  councilwoman's inquiry was not a complaint.  Rather, as Plaintiffs themselves state,
    Councilwoman Cobb wondered whether the cross violated the Establishment Clause,
22  conducted her own investigation, and determined it did not.  The Court finds no evidence the
    councilwoman herself had any complaint, or raised any.  Plaintiffs also argue this "shows
23  that the display of the Cross did not go undisputed and helps explain why other challenges
    did not then take place." *Id.* at 41:10–11. It does nothing of the sort.  Councilwoman Cobb's
24  bare inquiry — subsequently resolved without a call for action — can't possibly explain the
    absence of complaints from anyone else.

25      At oral argument, Plaintiffs also attempted to explain the lack of complaints by arguing
    that the La Jolla community historically maintained anti-Semitic policies, which caused all
26  Jewish citizens to fear making complaints.  Even assuming this to be true, it does not explain
    why there were no other complaints, nor why Jewish citizens waited to complain until
27  decades after the alleged anti-Semitic policies were ended.  Nor does it explain why Plaintiff
    Jewish Veterans, a national organization, would have been intimidated for 45 years.  Nor,
28  finally, does it explain why today, as pointed out at oral argument, all three local chapters of
    the Jewish War Veterans declined to join Plaintiffs' lawsuit.

to the 40-year period found to be determinative in Justice Breyer's concurrence in *Van Orden*, and exceeds the 30-year period in *Card*. As Justice Breyer explained:

> [T]hose 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion, to engage in any religious practice, to compel any religious practice, or to work deterrence of any religious belief. Those 40 years suggest that the public visiting the capitol grounds has considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage.

Id. at 702–03 (Breyer, J., concurring in the judgment).

As an adjunct to this point, the Court acknowledges the uncontested evidence that public support for or opposition to the memorial cuts across religious lines. While it is doubtless true "we do not count heads before enforcing the First Amendment," *McCreary*, 545 U.S. at 884 (O'Connor, J., concurring), the demographics here do not suggest the debate has much to do with faith or religious messages. Significant numbers of Christians, Jews, and members of other religions, as well as atheists, agnostics, and adherents of no religion can be found on both sides. *See* note 9, *ante*. While the named Plaintiffs and at least some of Jewish Veterans' members oppose the memorial, honestly perceiving it does not represent them, many non-Christian or non-religious veterans' families have purchased plaques in honor of their relatives and have had them installed there. Public officials (including, notably, most of Congress), representing constituencies with a diversity of religious views, have also largely supported maintaining the memorial intact. The Court deduces from this evidence that the memorial is apparently acceptable to a large segment of the public who, were they to perceive its message as a religious one, could be expected to oppose it. *See Van Orden*, 545 U.S. at 702–03 (Breyer, J., concurring in the judgment) (considering a lack of public opposition).

### d. Location of the Memorial

The majority opinion in *Van Orden* referred to earlier cases in which the high court determined the location of the display was an important factor. 545 U.S. at 690–91 (citing cases). For example, because the risk of indoctrination is great among school children, the

Supreme Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. *Id.* at 691 (citing *Aguillard*, 482 U.S. at 583–84). Justice Breyer's concurrence in *Van Orden* also called attention to "the physical setting of the monument" — there state capital grounds. *Id.* at 702. And as a final example, Justice Blackmun noted in *Allegheny* that when a challenged display is located near the seat of government, the implication of government endorsement is especially strong. *Allegheny*, 492 U.S. at 599–600. These references suggest the Court should reevaluate the location of the monument as part of the *Van Orden* analysis.

The Court incorporates its earlier discussion and conclusions from the effect analysis section here, but adds two observations. First, the Mt. Soledad memorial is found far off the beaten path. This differentiates it even from the monuments found Constitutional in *Van Orden* and *Card*, both of which were close to government buildings. If there is an inverse relationship between the proximity to government buildings and the implication of government endorsement, as *Allegheny* implies, the risk of endorsement here can hardly be considered strong.

Second, the "history and ubiquity," *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring), of the Latin cross as part of veterans' memorials has been generally established, and the memorial cross on Mt. Soledad is neither novel nor unique. The declaration of Jewish Veterans' representative, Maurice Eis, attests to as much. Mr. Eis says he visited the memorial for years knowing he would encounter the cross. (Eis Decl., ¶ 10.) The longstanding and well-known presence of the cross on Mt. Soledad is relevant "because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *Id.* Though the Latin cross has undisputed religious significance, its history on Mt. Soledad as a memorial commemorating veterans contradicts any contemporary perception it is strategically placed there to tout religion.

/ / /

/ / /

### e.    Donation of the Memorial

The cross was donated to the City of San Diego by the MSMA in 1954.  The MSMA also added the plaques and paving stones after individuals and groups purchased them. Although it is not clear from the record whether the other elements of the memorial were added by the MSMA or by the City of San Diego, all were in place when Congress took the site.  What amount, if any, the United States has paid or will pay the City in just compensation is not in evidence.  An objective observer, however, would know of the City's attempt to donate the memorial to the United States, and would also be aware of the bronze plaque at the base of the cross stating it was dedicated by the MSMA.

In *Van Orden*, the plurality opinion took special note of the Fraternal Order of Eagles' status as a social, civic, and patriotic organization, and that it had designed and paid for the Ten Commandments memorial.  545 U.S. at 682.  Justice Breyer's concurring analysis also emphasized the private civic and primarily secular status of the organization.  *Id.* at 701.

The monument in *Card* was donated by the same organization, and the Ninth Circuit's analysis took this into account.  520 F.3d at 1019.  *Card* relied particularly on Justice Breyer's point that it was proper to differentiate between the goals of the donating organization and the goals of the city. *Id.* at 1019–20. A city's goals, *Card* recognizes, might diverge somewhat from those of the organization, and include such additional goals as showing appreciation for the organization's efforts, or even "obtain[ing] inexpensive works of art on a scale large enough to decorate public property . . . ." *Id.* at 1020 (citation omitted). Although the donating organization's goals are to be considered, *Card* emphasizes "[t]he City's intent is the key here . . . ." *Id.*

*Card* also noted the circumstances of the donation and dedication, including the City of Everett's stated secular reasons for accepting the donated monument, which the court found plausible.  520 U.S. at 1020.  The involvement of clergy in the dedication of the monument, discussed as a factor in *McCreary*, 545 U.S. at 869, was not enough to render *Van Orden* inapposite. *Id.* at 1020 n.15. Finally, as in *Van Orden*, the prominent inscription showing the monument was donated by a private organization, "serves to send a message

1   to viewers that, while the monument sits on public land, it did not sprout from the minds of

2   City officials and was not funded from City coffers." *Id.* at 1020.

3       The history of the donation of the Mt. Soledad Memorial is similar in almost every

4   significant respect to that of *Van Orden* and *Card*. The cross and other elements of the

5   memorial were privately donated, just as in *Van Orden* and *Card*. As in *Card*, the plaque at

6   the base of the cross announces it was dedicated by the MSMA long before the federal

7   government acquired the memorial, which should make clear to the public the cross's

8   inclusion in the memorial was not the federal government's idea, nor did the federal

9   government finance it. Here too, as in *Card*, the dedication ceremony of Mt. Soledad was

10  privately organized; but unlike *Card*, the City of San Diego did not participate in the 1954

11  ceremony. 520 F.3d at 1020. Taking all of this into account, an objective observer would

12  attribute any religious emphasis or participation in the dedication ceremony to private

13  organizers and donors, rather than to the absent and passive recipient, the City of

14  San Diego. *Id.* at 1020 and n.15.

15      Moreover, it is even clearer in this case than in *Van Orden* or *Card* the government

16  entity that owns the property on which the memorial sits had no part in designing or financing

17  it. In those cases, the defendant governments received monuments directly from the donor

18  organization. Here, in contrast, the federal government is a step removed in the chain of

19  ownership, having acquired the memorial not from the MSMA, but from its donee, the City

20  of San Diego.

21      Because the Mt. Soledad memorial was taken by the United States government rather

22  than donated to it, issues surrounding the original donation of the monument to the City of

23  San Diego are less relevant here. But even to the extent the Court considers the original

24  1954 donation, there is nothing about it or the attendant ceremony that suggests an abiding

25  religious association.

26                    **f.     Passive or Proselytizing Effect**

27      *Van Orden* described the Ten Commandments monument as passive, 545 U.S. at

28  686, unlike other more confrontational displays which were meant to indoctrinate. *Id.* at 691,

703 (citing *Stone*, 449 U.S. 39). The gist of this observation is that passive monuments are less likely to violate the Establishment Clause.

Much of what is relevant here is subsumed within the Court's effect analysis under *Lemon*; the Court incorporates that discussion with this part of the *Van Orden* analysis. *Van Orden* explained that, while the Ten Commandments are religious, they also have "undeniable historical meaning." 545 U.S. at 690. More so than the Ten Commandments, the cross has an established secondary meaning, and as the evidence demonstrates, it is non-religious. As the Court's discussion of the monument's purpose and effect establishes, particularly when it appears in military memorials, the cross is likely to convey a non-religious meaning.

Unlike the Ten Commandments memorials, which begin with the express directive "I AM the LORD thy God. Thou shalt have no other gods before me," an unadorned cross issues no commands, instructions, or teachings, nor does it express acknowledgment of anything. Indeed, the absence of an explicit message most likely explains the various subjective interpretations of the memorial in this case. The only verbal elements in the Mt. Soledad memorial are contained in the plaques, bollards, and paving stones, and Plaintiffs do not challenge these. Because of its physical setting, the memorial itself does not even implicitly encourage any particular religious response to the cross. By contrast, the sidewalks adjacent to the walls appear to invite visitors to view the plaques, and secondarily the bollards and paving stones. Any exhortation emanating from this passive monument pertains to remembering the veterans who are recognized there.

### g. *Van Orden* Conclusion

*Van Orden* instructs courts to exercise reasoned judgment in drawing lines in Establishment Clause cases. When the symbol at issue — here a Latin cross — conveys not simply a religious message but also a secular message, drawing a sharp line can be hard to do. That said, and with all respect to the Plaintiffs in this case, whose views the Court has carefully and respectfully considered, the Court finds the memorial at Mt. Soledad, including its Latin cross, communicates the primarily non-religious messages of military

1  service, death, and sacrifice. As such, despite its location on public land, the memorial is

2  Constitutional.

3  **C.    Additional Considerations**

4  The Congressional *Amici* have also raised concerns that an adverse decision would

5  imperil numerous publicly owned and controlled veterans' memorials and cemeteries,

6  creating a wide-ranging impact.  (Brief of Congressional *Amici* at 9:3–20.)  This is a valid

7  concern, bearing in mind the large number of crosses in military memorials. *See Van Orden*,

8  545 U.S. at 704 (Breyer, J., concurring in the judgment) (citation omitted) (expressing

9  concern that ordering the monument removed "might well encourage disputes concerning

10  the removal of longstanding depictions of the Ten Commandments from public buildings

11  across the Nation [and] thereby create the very kind of religiously based divisiveness that the

12  Establishment Clause seeks to avoid").  In view of the Court's conclusion that the Mt.

13  Soledad Veterans Memorial does not violate the Establishment Clause, the Court need not

14  address this point.

15  **III.    Conclusion and Order**

16  For reasons set out above, the Court finds Plaintiffs have failed to meet their burden

17  of showing they are entitled to summary judgment, and their motion is **DENIED**.  Because

18  Plaintiffs fail to raise a triable issue of material fact as to the Constitutionality of the Mt.

19  Soledad Veterans Memorial, Defendants are entitled to judgment as a matter of law.

20  Defendants' motion for summary judgment is **GRANTED**.  Plaintiffs' request for declaratory

21  and injunctive relief is **DENIED,** and the complaints, now consolidated, are **DISMISSED**

22  **WITH PREJUDICE**.  All other pending motions are **DENIED AS MOOT**.

23  **IT IS SO ORDERED**.

24  DATED:  July 29, 2008

25

26  **HONORABLE LARRY ALAN BURNS**
    United States District Judge

27

28

- 36 -